## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1021 | **DATE** | 9/29/2003 |
| **CASE TITLE** | ICI Americas, Inc. vs. Lake River Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, F. Hyman's motion for summary judgment [35-1] is denied. F. Hyman's request for fees and costs and request to strike the opinions of Buddy Jenkins and Chester Schirmer from the record are also denied. A status hearing is set for 10/29/03 at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

SEP 3 0 2003
date docketed

docketing deputy initials

date mailed notice

**Document Number**

54

hmb

courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 SEP 29 PM 12:23

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ICI AMERICAS, INC., a Delaware )
Corporation, and INDOPCO, INC., a )
Delaware Corporation, )
)
Plaintiff, )
)
vs. )           Case No. 01 C 1021
)
LAKE RIVER CORPORATION, an )           Magistrate Judge Nan Nolan
Illinois Corporation, and F. HYMAN & )
COMPANY, INC., an Illinois Corporation, )
)
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiffs ICI Americas, Inc., a Delaware corporation, and Indopco, Inc., a Delaware corporation (collectively, "ICI"), filed suit against defendants Lake River Corp., an Illinois corporation ("Lake River"), and F. Hyman & Co., Inc., an Illinois corporation ("F. Hyman"), alleging that F. Hyman was negligent for failing to provide Lake River with information relating to unique fire hazards associated with the handling and storage of F. Hyman's raw cotton bales, and for storing the cotton bales in a warehouse that did not have appropriate fire protection. ICI has since settled with Lake River, and Lake River has been dismissed from the lawsuit. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This matter is now before the Court on F. Hyman's motion for summary judgment. For the reasons set forth below, the motion is denied.

54

# FACTUAL BACKGROUND

## A.  Parties

Plaintiffs ICI Americas, Inc. and Indopco, Inc. are American subsidiaries of ICI America Holdings, Inc., and are headquartered in Bridgewater, New Jersey. Def. Facts ¶¶A, B. ICI manufactures and sells a wide variety of chemical products. Am. Cpt. ¶¶1-2.

Defendant F. Hyman operates a manufacturing facility in Chicago, Illinois. Def. Facts ¶¶E, 5. F. Hyman purchases bales of cotton by-products (hereinafter, "baled cotton" or "cotton bales") from various suppliers for manufacturing, including gin motes, linters, and card waste. Def. Facts ¶7. After the cotton bales are purchased by F. Hyman, they are shipped by truck to a warehouse where F. Hyman stores its materials. Def. Facts ¶8. They remain in the warehouse until they are needed by F. Hyman for its manufacturing process. Def. Facts ¶8.

Lake River operates several warehouses in the Chicago area. Def. Facts ¶11. Both ICI and F. Hyman rented warehouse space from Lake River to store their products.

## B.  The storage of F. Hyman's cotton bales

F. Hyman has rented warehouse space from Lake River to store its cotton materials for many years. Def. Facts ¶E, 11. Prior to May 20, 2000, F. Hyman had been storing its cotton bales at Lake River's warehouse in Bedford Park, Illinois. Pl. Facts ¶29. Lake River did not consider F. Hyman's cotton bales to be flammable and stored them in the general goods area of the Bedford Park warehouse as opposed to the special "flammable area." Def. Facts ¶48. On approximately May 11, 2000, Volkhard Niemeier, the manager of the Bedford Park warehouse, contacted Ravi Kobalawa, the owner of F. Hyman, to advise him that Lake River wanted to move the cotton bales from its

Bedford Park warehouse to its Summit, Illinois warehouse. Pl. Facts ¶30.[1] The baled cotton at issue had been shipped directly from one of F. Hyman's suppliers to Lake River's warehouse where it had been stored for a period of time. Def. Facts ¶¶65, 67. Kobalawa agreed to the transfer. Pl. Facts ¶31. Kobalawa was not advised that the baled cotton would be stored any differently at the Summit warehouse than it had been at the Bedford Park warehouse, such as in the absence of fire suppression equipment. Def. Facts ¶16. Nor did Kobalawa inquire as to whether there would be any fire suppression equipment at the Summit warehouse. Pl. Facts ¶¶32A. As it turned out, while the Bedford Park warehouse had a sprinkler system, the Summit warehouse did not. Def. Facts ¶1; Pl. Facts ¶¶20, 23.[2] Kobalawa also was not informed as to exactly how or when the baled cotton would be moved; he was only informed that it would be moved within the next few weeks. Def. Facts ¶¶18, 21, 54. During the telephone call, Kobalawa asked Lake River to inform him of the exact date on which the baled cotton would be moved. Def. Facts ¶19.

On May 20, 2000, Lake River moved the baled cotton from the Bedford Park warehouse to the Summit warehouse. Def. Facts ¶¶1, 22. Despite Kobalawa's request, Lake River never contacted Kobalawa again to let him know the exact date on which it was being moved. Def. Facts ¶¶19, 55. Nor did Lake River request any guidance from F. Hyman as to the appropriate method to use in transferring or storing the cotton. Def. Facts ¶¶20, 51-53. The move was completed at approximately 2:00 p.m. Def. Facts ¶22. The bales were stacked 12 to 15 feet high in the Summit

---

[1]     F. Hyman disputes that the telephone call took place on May 11, 2000, and asserts that it took place two to three weeks prior to May 20, 2000, instead. This dispute is not material. Thus, for purposes of this motion, the Court draws this inference in favor of ICI, the non-movant.

[2]     Niemeier was unaware that the Summit warehouse did not have a sprinkler system at the time of his telephone conference with Kobalawa. Def. Facts ¶17.

3

warehouse. Pl. Facts ¶11. Some of the bales were wrapped in burlap; others were wrapped in plastic. Pl. Facts ¶27. Many were bound with wire bale ties. Pl. Facts ¶27.

## C.     The fire at the Summit warehouse

On May 20, 2000, the day the bales were transferred, a fire occurred in the Summit warehouse. Def. Facts ¶¶3, 23. The fire occurred between 11:50 p.m. and midnight, and was a "four alarm" fire, necessitating the involvement of 125 firefighters and emergency response personnel. Pl. Facts ¶5; Def. Facts ¶¶3, 23. Firefighters were on the scene for approximately 14 hours. Pl. Facts ¶12. When the firefighters first gained entry into the warehouse, they observed cotton bales on fire. Pl. Facts ¶¶7, 9. The firefighters and several Lake River employees helped push the bales of cotton outside the warehouse. Pl. Facts ¶13. When some of the bales of cotton which appeared to be intact were removed from the warehouse, they burst into flames after their ties were cut. Pl. Facts ¶14; Ex. 5 of Ferreti Aff., pp. 64-65, 152-54. The fire ultimately destroyed ICI's chemical products which were being stored at the Summit warehouse at that time. Am. Cpt. ¶¶ 13, 24, 29. It is undisputed that the cotton provided the fuel for the fire. Pl. Facts ¶10.

Upon leaving the scene, the firefighters left fire suppression lines for the cleanup crews to use because there were still smoldering fires within the piles. Pl. Facts ¶12. Cotton bales which had been removed from the building continued to flare up periodically for days after the fire. Pl. Facts ¶16.

## D.     The fire inspection

The morning after the fire, Joseph Mazzone, a fire cause and origin investigator, inspected the site and determined that the fire originated in the area in which F. Hyman's cotton bales had been stored. Pl. Facts ¶¶4, 19. Stephen Hoyle, a fire cause and origin investigator hired by ICI, also

inspected the site after the fire. Pl. Facts ¶20. Hoyle similarly observed that the concrete floor on which the cotton bales had been stored, and the concrete beams above that area, showed extensive fire and heat damage. Pl. Facts ¶20.

It is undisputed that the exact catalyst that caused the fire is unknown. Def. Facts ¶4. The parties have several theories as to how the fire may have started, though. One theory is that the fire was caused by the presence of a "fire-packed bale." A fire-packed bale occurs when a rock or something similar gets mixed in with the cotton while it is being baled and, after rotating in the baling machines, becomes so hot that it burns the cotton on the inside of the bale. Def. Facts ¶60. A fire-packed bale becomes apparent within a few hours or days after it is baled because either a fire appears on the bale's surface or there is a distinctive odor associated with the bale. Pl. Facts ¶33; Def. Facts ¶62. Several of F. Hyman's suppliers testified that if a fire-packed bale is identified during the course of processing, they will put the freshly baled cotton aside for observance before loading it on a truck for shipping. Ex. 6 of Ferreti Aff., pp. 68-69; Ex. 7 of Ferreti Aff., pp. 18-19. Another one of F. Hyman's suppliers testified that he will wait 24 hours as a matter of course before shipping bales for this reason. Ex. 7 of Ferreti Aff., p. 18. Another theory is that the fire was caused by the "dragging" of a bale. A fire can occur when a cotton bale that is bound with wire is dragged across a concrete floor. Pl. Facts ¶34. This dragging can result in a spark which may smolder in the bale for several hours before a fire actually starts. Pl. Facts ¶34. Carl Lehner, the CEO of Leigh Fibers, one of F. Hyman's suppliers, opined that the fire in this case was most likely caused by the dragging of a bale during the transfer of bales to the Summit warehouse. Ex. 16 of Ferreti Aff. Leigh Fibers has experienced such dragging-caused fires a number of times. Pl. Facts ¶35. At least two of F. Hyman's suppliers, including Leigh Fibers, instruct their workers to avoid dragging cotton

5

bales for this reason. Pl. Facts ¶36. Lake River has similarly instructed its workers not to drag metal bands (such as the wire ties holding the cotton bales together) across concrete, and at least one of the warehouse workers testified that he knew not to drag cotton bales. Ex. 3 of Alperin Second Aff., pp. 49-52.

After the fire, Lake River decided not to continue storing F. Hyman's baled cotton. Pl. Facts ¶47; Ex. 5 of Ferreti Aff., pp. 61-62. Lake River's principal, Roy Phillips, testified that if there were any particularly dangerous characteristics of baled cotton, he assumed that he would have been advised of them through either the government's requiring of some sort of labeling or the customer's (F. Hyman's) relaying of the necessary information. Pl. Facts ¶48; Ex. 5 of Ferreti Aff., p. 80.

F. Hyman maintains sprinklers in its own manufacturing facility. Pl. Facts ¶32B. It is undisputed that if the Summit warehouse had been equipped with sprinklers on the day of the fire, the fire would not have extended past its point of origin. Pl. Facts ¶24; Def. Facts ¶27.

## E.     Baled cotton's propensity to present a dangerous condition

The Material Safety Data Sheets (MSDSs) for baled cotton state that there are no special fire procedures required or unusual fire or explosion hazards presented by baled cotton. Def. Facts ¶43. OSHA does not list baled cotton as a "hazardous" material. The International Maritime Organization discontinued treating baled cotton as a product posing risk of fire. The DOT has no regulation requiring that baled cotton be accompanied by any warnings or labels concerning fire hazard. Def. Facts ¶¶44-46. The Village of Summit, however, adopted the 1996 editions of the BOCA National Building Code and the BOCA National Fire Protection Code, which address, inter alia, the safekeeping of cotton. Pl. Facts ¶25; Ex. 18 of Ferreti Aff. The Fire Prevention Code applies to "equipment, processes and operations involving combustible fibers" which include "readily ignitable

and free-burning fibers, such as cotton ..." Ex. 20 of Ferreti Aff., p. 105. The Code classifies occupancies containing baled combustible fibers exceeding 1,000 cubic feet as Use Group H-3 occupancies, which are defined as "high hazard" occupancies by the BOCA National Building Code. Id.; Ex. 21 of Ferreti Aff., p. 23. The Code further provides that "all high hazard occupancies shall be equipped throughout with an approved *automatic fire suppression system.*" Ex. 20 of Ferreti Aff., p. 25 (emphasis in original).[3]

ICI contends that when Lake River began storing F. Hyman's cotton in the mid 1990s, it asked F. Hyman to provide it with MSDS information pertaining to the baled cotton. According to ICI, F. Hyman never provided Lake River with such information, nor with any information regarding how to store or handle the baled cotton. Pl. Facts ¶¶42-43; Ex. 1 of Ferreti Aff., pp. 35-36, 48-49.[4]

F. Hyman has never received any warning from its suppliers regarding any allegedly hazardous condition (e.g., flammability or combustibility) with respect to its cotton bales. Def. Facts ¶¶40-42.[5] F. Hyman also has never received any warning that cotton bales present special handling or storage requirements due to their potential for fire. Def. Facts ¶41. It is undisputed that F. Hyman never asked at least two of its suppliers for information regarding the proper handling and storage

---

[3]     Chester Schirmer, a fire protection engineer with nearly 50 years of experience, opines that the BOCA Fire Prevention Code imposes responsibility for compliance with its provisions on any "occupant" of a structure that creates a condition in violation of the Code. He further opines that it is possible for more than one person to share responsibility for violations of the Code. Ex. 22 of Ferreti Aff., p. 3.

[4]     F. Hyman disputes these contentions.

[5]     F. Hyman contends that baled cotton is not readily combustible because of its density. Def. Facts ¶¶28, 31-33. ICI disputes this contention. Pl. Resp. to Def. Facts ¶¶28, 31-33. F. Hyman also contends that baled cotton will char and smolder but not catch fire. Def. Facts ¶26. ICI disputes this contention, as well. Pl. Resp. to Def. Facts ¶26.

of baled cotton. Pl. Facts ¶40.[6] Several suppliers testified that they would have provided F. Hyman with such information had they received such a request. Pl. Facts ¶41.

Prior to May 20, 2000, Lake River had never experienced any fire problems associated with baled cotton. Def. Facts ¶¶49, 70. Similarly, F. Hyman had never experienced any fire problems with respect to its baled cotton while the cotton was being stored in a warehouse. Def. Facts ¶¶25, 68. F. Hyman had experienced a fire involving cotton bales, however. That fire involved bales which had been stored in a truck in F. Hyman's receiving area. The fire arose due to careless smoking by a vagrant. Ex. 3 of Ferreti Aff., pp. 123-126. At least two of F. Hyman's suppliers also have experienced fires involving baled cotton at their facilities. Pl. Facts ¶38. These suppliers prohibit smoking near their facilities. Def. Resp. to Pl. Facts ¶39. Lake River also prohibits smoking near its facilities. Ex. 3 of Alperin Second Aff., p. 55.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, we view the evidence and draw all reasonable inferences in favor of the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

---

[6]    The record does not indicate whether F. Hyman ever asked any other suppliers for such information.

## Common Law Negligence

A bailment is present when there is an agreement by the bailee to take possession of the bailor's property and there is delivery and acceptance of the property into the possession and control of the bailee. See American Ambassador Cas. Co. v. City of Chicago, 205 Ill. App. 3d 879, 563 N.E.2d 882, 884 (1st Dist. 1990). In this case, F. Hyman and ICI are bailors, and Lake River is their bailee. Generally, under Illinois law a bailor cannot be held liable to a third party for injuries resulting from his bailee's negligent use of bailed property. Moreno v. Beckwith, 77 Ill. App. 2d 443, 222 N.E.2d 918, 921 (2d Dist. 1967); Wadycki v. Vanee Foods Co., 208 Ill. App. 3d 492, 567 N.E.2d 423, 427 (1st Dist. 1990). However, an exception to this rule exists, and a bailor is liable to third parties for injuries suffered, if: (1) the bailor supplied the chattel in question; (2) the chattel was defective (or dangerous) at the time it was supplied; (3) the defect (or danger) could have been discovered by a reasonable inspection, when inspection is required (i.e., where the danger of substantial harm is great); and (4) the defect (or danger) was the proximate cause of the injury. Huckabee v. Bell & Howell, Inc., 47 Ill.2d 153, 265 N.E.2d 134, 158 (1970) (citing cases adopting the Restatement (Second) of Torts (secs. 388, 395, and 408));[7] see also Matei v. Cessna Aircraft Co.,

---

[7]    Section 388 of the Restatement (Second) of Torts ("Chattel Known to be Dangerous for Intended Use") states: "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect ... to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows or has reason to know that the chattel is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or the facts which make it likely to be dangerous." Comment c of Section 388 provides that the rule applies to "all kinds of bailors, irrespective of whether the bailment is for reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safe keeping, or repair." Comment d explains that "one supplying a chattel to be used or dealt with by others is subject to liability under the rules stated in this Section, not only to those for whose use the chattel is supplied but also to third persons whom the supplier should expect to be endangered by its use."

35 F.3d 1142, 1144 (7th Cir. 1994); Merckens Chocolate Co. v. Ray Emerick's Warehouse Co., Inc., Case No. 91 C 0051, 1991 WL 140917, at *3 (N.D. Ill. 1991); Jones v. McCook Drum & Barrel Co., Inc., 229 Ill. App. 3d 1083, 595 N.E.2d 670, 672 (3rd Dist. 1992); Brooks v. Essex Crane Rental Corp., 233 Ill. App. 3d 736, 599 N.E.2d 111, 113 (4th Dist. 1992).

Here, it is undisputed that bailor, F. Hyman, supplied the chattel in question (the baled cotton). Def. Facts ¶¶E, 11, 65, 67. Thus, what remains at issue is whether the cotton bales had the propensity for danger at the time they were supplied; whether the cotton bales' propensity for danger could have been discovered by reasonable inspection; and whether the cotton bales' propensity for danger was the proximate cause of ICI's damages. The Court will address each issue in turn.

A.    **Dangerous Condition**

F. Hyman argues that no dangerous condition existed with respect to the baled cotton. F. Hyman asserts several arguments in support of this contention. First, F. Hyman argues that the compression levels of the cotton bales at issue precluded any fire from having arisen out of them as there would have been insufficient oxygen to rapidly feed upon the cotton and start the fire.[8] Next, F. Hyman argues that merely because a material may be combustible or flammable does not mean it is "dangerous," as nearly all material is combustible or flammable because "everything burns." Def. Brf., p. 9. Finally, to support its contention that baled cotton is not dangerous, F. Hyman asserts that it has never suffered a warehouse-related fire involving cotton bales and has never been advised

---

[8]    In support of this argument, F. Hyman relies on the deposition testimony of its proposed expert, Dr. Philip Wakelyn, a scientist for environmental health safety for the National Cotton Council of America and a member of a U.S. Department of Agriculture committee on flammability research of cotton, who opined that the densities obtained in modern day baling techniques used in the cotton industry shut out the oxygen necessary to support combustion. Def. Facts ¶ 31 (citing Ex. G; Ex. B to Ex. I, pp. 72-73, 96-101; & Ex. N at pp. 56-57 of Alperin Ex.).

that baled cotton presents an unusual fire hazard. With respect to the latter point, F. Hyman points to the facts that its suppliers have never advised it of any dangerous conditions; the MSDS information associated with cotton bales does not state that any unusual fire hazards are presented by the products; OSHA does not list baled cotton as a "hazardous" material; the International Maritime Organization no longer treats baled cotton as posing a risk of fire; and the DOT has no regulation requiring that baled cotton be accompanied by warnings or labels concerning fire hazard. Def. Facts ¶44-46.

ICI, in response, contends that F. Hyman's baled cotton does present a dangerous condition based on its status as a highly flammable and combustible material. In support of its contention that the bales are highly flammable and combustible, ICI points out that the fire originated in the cotton bales, the cotton bales provided the fuel load for the fire, many of the cotton bales were observed emanating flames during the fire, and even the cotton bales which appeared to be intact burst into flames after their ties were cut. ICI further points to the severe nature of the fire, namely, the fact that it was a "four alarm" fire which required the assistance of 125 firefighters and emergency response personnel, and that the bales continued to flare up for days after the fire. In addition, ICI relies on the deposition testimony of Buddy Jenkins, an experienced fire cause and origin investigator, who opined that storing large quantities of baled combustible fibers such as cotton presents a significant fire hazard, particularly when stored in a facility without an automatic fire suppression system, and that cotton bales require particular handling and storage precautions because they can be easily ignited by a fire-packed bale, dragging, or the exhaust of a truck. Ex. 15 of Ferreti Aff., p. 2. ICI also relies on the BOCA fire prevention regulations discussed above which state that certain specified cotton products may be stored only in a facility with sprinklers. Finally, as for F.

11

Hyman's argument regarding the compression level of the bales, ICI asserts that this argument is "suspect" as it is based on a study involving cotton bales that had different densities than those stored at the Lake River warehouse. Pl. Brf., pp. 13-14; Ex. 23 of Ferreti Aff., pp. 96, 138.

The Court agrees that the mere fact that a material may be combustible does not necessarily mean that it is dangerous. See Driscoll v. C. Rasmussen Corp., 35 Ill.2d 74, 219 N.E.2d 483, 485 (1966) (finding that trash pile containing combustible paint was not a dangerous condition); Feldscher v. E & B, Inc., 95 Ill.2d 360, 447 N.E.2d 1331, 1335-36 (1983). However, ICI has presented evidence in this case tending to refute F. Hyman's contention that the baled cotton was not combustible or highly flammable and did not present a dangerous condition; namely, the fact that the bales provided the fuel load for the fire, the intensity and severe nature of the fire, and the opinion testimony by ICI's proposed expert that the bales presented a significant fire hazard when stored without fire suppression equipment. Moreover, although F. Hyman presented strong evidence through Dr. Wakelyn that the bales were not combustible, ICI identified a potential flaw in Dr. Wakelyn's analysis. The Court finds this to be sufficient here.[9] Viewing all factual inferences in a light most favorable to ICI, the Court finds a genuine issue of material fact as to whether the bales in this case were combustible or flammable and presented a dangerous condition.

**B.** **Reasonable inspection**

The next issue to be addressed is whether the bales' alleged dangerous condition could have been discovered by a reasonable inspection by F. Hyman, or, more specifically, whether F. Hyman knew or should have known that its cotton bales were dangerous when they were supplied to Lake

---

[9] See Comment g of Section 388 of the Restatement (Second) of Torts (stating "there are many chattels which, even though perfect, are unsafe for any use or for the particular use for which they are supplied unless their properties and capabilities are known to those who use them").

12

River. F. Hyman argues that it could not have discovered the alleged combustibility of the bales because, as mentioned above, none of its suppliers had ever warned it that the bales were hazardous or required special handling or storage requirements, the MSDSs provided no warning regarding the alleged dangers of the cotton bales, and neither F. Hyman nor Lake River had ever experienced a warehouse fire involving cotton bales. ICI, on the other hand, argues that F. Hyman either was aware of the bales' potential for danger, or should have conducted a reasonable inspection to have made it so aware. With respect to the first point – that F. Hyman was aware of the alleged dangers presented by the cotton bales – ICI argues that F. Hyman has been in the cotton manufacturing business for many years and has suffered at least one fire involving cotton bales at its facility, as have several of its suppliers. Moreover, ICI argues, F. Hyman's own manufacturing facility is equipped with an automatic fire suppression system and it applies flame retardant chemicals to some of its cotton products. Ex. 3 of Ferreti Aff., pp. 21, 93. ICI contends, next, that if F. Hyman was actually unaware of the dangerous conditions presented by the cotton bales, a mere call to one of its suppliers regarding the proper storage and handling procedures with respect to the baled cotton would have made it so aware. ICI points out that the suppliers testified they would have provided such information had they been asked. ICI also argues that the fire F. Hyman previously suffered at its facility should have caused it to at least investigate the flammability of cotton bales.

F. Hyman argues that it could not have made an inspection because it was not informed as to when its bales would be moved to the Summit warehouse, much less given time to ascertain that the new warehouse had no sprinklers. To this argument, ICI asserts that F. Hyman had more than enough time to determine whether the new warehouse had a sprinkler system, as Kobalawa, F. Hyman's owner, was advised during his telephone conference with Niemeier at least one week prior

to the move that the bales would be moved to a new warehouse. Pl. Facts ¶¶30-31. ICI also argues that F. Hyman had ample time to warn Lake River about its need to have its products stored in a warehouse with a sprinkler system generally, because it had been storing its products with Lake River for years.

Based on the record before the Court, and drawing all factual inferences in a light most favorable to ICI, the Court finds that a genuine dispute of material fact exists as to whether F. Hyman had reason to know that its baled cotton was likely to be dangerous and that special storage and handling procedures existed with respect to the baled cotton. Although, as discussed above, the Court finds that a genuine dispute of material fact exists as to whether a dangerous condition even exists, it does not agree that a reasonable inspection could not have been made, and finds that this issue must be submitted to a jury.

## C.    Proximate cause

Finally, F. Hyman argues that proximate cause between ICI's damages and the alleged flammability of its bales is lacking for three reasons: (1) F. Hyman merely owned the allegedly flammable goods; (2) Lake River's failure to prevent harm is a superseding intervening cause; and (3) F. Hyman's baled cotton was a "condition" to, and not a causation of, the damages suffered by ICI. The Court notes, as a preliminary matter, that the question of proximate cause is generally for the jury. Felty v. New Berlin Transit, Inc., 71 Ill. 2d 126, 374 N.E.2d 203, 205 (1978).

### 1.    Mere ownership of flammable goods

F. Hyman first argues that its mere ownership of flammable or combustible material does not automatically make it negligent for the damages caused by the ignition of that material. F. Hyman contends that although it owned the bales at the time of the fire, it did not have any control over them

14

at that time due to its bailment with Lake River, and its actions had nothing to do with the start of the fire. In support of this contention, F. Hyman argues that the fire was not and could not have been caused by spontaneous combustion of the bales or by the presence of a fire-packed bale, and, instead, was caused by some external force. ICI disputes that F. Hyman's involvement in the fire was "mere ownership" of the cotton bales, based on its assertion that it was F. Hyman's cotton bales that started the fire.[10] ICI further asserts that liability does not hinge on a finding that the bales actually started the fire, in any event.

The Court agrees that mere ownership of flammable material does not necessarily lead to negligence for damages caused by the ignition of that material. See Driscoll, 219 N.E.2d at 485 ("[A] person cannot reasonably be required to anticipate [unusual or extraordinary uses] in the absence of something to put him on notice of such a practice"). However, the Court does not agree that merely because F. Hyman (or even its cotton bales) did not start the fire, it cannot be liable. In Merckens, there was apparently no allegation that the defendant-bailor's product actually caused the collapse of the shelving unit which led to the damages in that case. 1991 WL 140917, at *1. Yet the bailor in that case was potentially liable due to its failure to have provided the warehouse with enough information regarding the harm that could have been caused by its product when exposed to other goods. Id. at *3. Similarly, here, liability may be premised on F. Hyman's failure to provide

---

[10]     In support of this contention, ICI argues that the fire could have been caused by a fire-packed bale, spontaneous combustion, or dragging. Regarding the last point, ICI relies on the testimony of Carl Lehner, who opined that the fire was most likely caused by the dragging of bales during the transfer of the bales from one warehouse to another. Ex. 16 of Ferreti Aff. ICI also relies on the fact that the fire originated in the area of the warehouse where the bales were stored and that the bales served as fuel for the fire to support its contention that the bales started the fire.

enough information regarding the harm that could be caused by its cotton bales.[11] Thus, the Court finds that F. Hyman's "mere ownership" of the baled cotton and its contention that it did not start the fire do not preclude a finding of proximate cause in this case.

2.     Superseding, intervening cause

Next, F. Hyman argues that proximate cause is lacking because Lake River's negligence constituted a superseding, intervening cause. Proximate cause is lacking "where the independent acts of a third person break the causal connection between the alleged original wrong and the injury. When that occurs, the independent act itself becomes a proximate or immediate cause." Thompson v. County of Cook, 154 Ill.2d 374, 609 N.E.2d 290, 294 (1993) (citations omitted). According to F. Hyman, Lake River failed to prevent harm to ICI's product when it negligently transferred and stored F. Hyman's baled cotton in a warehouse without sprinklers. F. Hyman argues that it had no reason to know that Lake River would engage in such negligent handling or storing practices, given that Lake River had consistently stored its goods in a warehouse with sprinklers until the time of the fire and had a general duty and statutory duty under BOCA to provide sprinklers. Def. Brf., p. 13; Ex. J of Alperin Aff., at 2. F. Hyman also argues that it was entitled to rely on Lake River to properly transfer and store its bales in this case because Lake River was knowledgeable about safe storage practices.

ICI argues that the damages were not caused by Lake River's alleged negligence, but, rather, by F. Hyman's failure to provide Lake River with the necessary information regarding how to handle and store the baled cotton (e.g., that Lake River should store the bales in an area with fire

---

[11]     Moreover, as ICI points out, liability has been imposed on defendants whose products did not start a fire but instead contributed to the spread and/or damages resulting from the fire. See, e.g., King v. Exchange Nat'l Bank of Chicago, 64 Ill. App. 3d 335, 381 N.E.2d 356, 362 (1st Dist. 1978).

suppression equipment, avoid dragging the bales, and check for the presence of fire-packed bales). ICI argues that Lake River's alleged negligence was therefore foreseeable based on F. Hyman's failure to provide Lake River with any handling or storage information or the MSDS information it had specifically requested. ICI argues that, without such information, Lake River's representatives did not and could not appreciate the potential fire hazards presented by the handling and storage of baled cotton. ICI points to the testimony of Lake River's principal in support of this argument, who stated that Lake River never realized that "cotton could burn like it burned." Ex. 5 of Ferreti Aff., p. 38. ICI argues that if Lake River had been informed about the highly flammable nature of baled cotton, Lake River would have either treated it as a flammable product when storing it or declined to store it altogether. ICI argues that F. Hyman, as the owner of the cotton bales and the entity who used cotton bales in its business for many years was in the much better position to know the flammable nature of its products than the warehouse who simply stored them.

An intervening force does not break the chain of legal causation if the intervening force is foreseeable. See Felty, 374 N.E.2d at 205. Here, there is a factual dispute as to whether F. Hyman was reasonable in relying on Lake River without having provided it with any specific storage and handling information and thus whether Lake River's actions were foreseeable or not. F. Hyman contends that Lake River, an experienced warehouser, should have appreciated the potential dangers associated with storing cotton bales and should have taken care to store the cotton bales in a warehouse with sprinklers. ICI, on the other hand, contends that no one was in no better position to know about the proper handling and storing procedures with respect to the baled cotton than F. Hyman, and that it was up to F. Hyman to advise Lake River of these procedures in order to prevent any harm from ensuing. At a minimum, the parties dispute whether Lake River ever asked F. Hyman

17

for MSDS information regarding the cotton bales (which F. Hyman admittedly never provided) and whether F. Hyman provided Lake River with any information regarding the storage and handling of the bales. Pl. Facts ¶¶42-44.[12] This factual dispute is material to the issue of proximate cause. Accordingly, the Court finds that a jury must decide whether it was foreseeable that Lake River's workers might engage in negligent storage and handling of the bales, in the absence of any information from F. Hyman advising it not to do so.

3.     Condition leading to damages

Finally, F. Hyman argues that there is no proximate cause between F. Hyman's actions or omissions and ICI's damages because F. Hyman's ownership of the baled cotton was merely a condition that led to ICI's damages rather than a causation of ICI's damages. See First Springfield Bank & Trust v. Galman, 188 Ill.2d 252, 720 N.E.2d 1068, 1071 (1999) ("[I]f the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury.") (citations omitted).

ICI does not dispute this statement of the law, but argues that the bales were not a mere condition in the fire, they were a significant factor in the cause and intensity of the fire. Based on the record, the Court is unable to find that F. Hyman's negligence, if any, amounted to nothing more than the furnishing of a condition by which ICI's damages were made possible. Genuine issues of

---

[12]     As to the latter point, F. Hyman denies that the reference cited in ICI's Facts supports this fact. Def. Resp. to Pl. Facts ¶44. With respect to Lake River's alleged request for MSDS information, F. Hyman asserts that the information would have been irrelevant in any event, as it contained no special fire hazard information with respect to baled cotton. Def. Resp. to Pl. Facts ¶43.

material fact exist as to whether F. Hyman's negligence was or was not the proximate cause of ICI's damages. As such, summary judgment is denied.[13]

### F. Hyman's Request to Strike

At the very end of its reply brief, F. Hyman makes a cursory request for the Court to strike from the record the opinions of ICI's proposed expert witnesses, Buddy Jenkins and Chester Schirmer. Def. Reply Brf., p. 15. ICI relies on the testimony and expert report of Jenkins to support its contention that the bales can be easily ignited due to the presence of a fire packed bale or to sparks resulting from friction between bale ties and a concrete floor when dragged across the floor. Pl. Facts ¶¶ 33-34; Pl. Brf., p. 16.[14] ICI relies on the testimony and expert report of Schirmer to support its views as to the proper interpretation of the BOCA Fire Code, and asserts that Schirmer has tested the effectiveness of sprinklers on cotton bale fires. Pl. Brf., pp. 18-19. F. Hyman asserts that neither individual is qualified to opine about the combustibility of cotton.[15] Both of the

---

[13]      When F. Hyman filed its motion for summary judgment, the parties believed that ICI's suit against F. Hyman and Lake River had been consolidated with another suit brought by M. Diane Koken on behalf of Reliance Insurance Company ("Reliance") against F. Hyman, Case No. 02 C 3610, which is before Judge Lefkow. Judge Lefkow subsequently issued a minute order, however, in which she clarified that F. Hyman's motion to consolidate the two cases had been denied, and stayed further proceedings in that case until a decision on F. Hyman's motion for summary judgement was issued in this case. F. Hyman addressed Reliance's count of strict liability in its motion for summary judgment, a count not alleged in ICI's suit. Thus, the Court does not address F. Hyman's arguments with respect to the strict liability count alleged in Reliance's suit.

[14]      In addition, Jenkins explains his opinion as to the proper handling of bales, and opines that storing large quantities of combustible fibers presents a significant fire hazard, particularly when stored without fire suppression equipment present. Pl. Brf., pp. 15-16. Jenkins further opines that the fire would not have extended past the point of origin if sprinklers had been present. Pl. Brf., p. 27; Pl. Facts ¶24.

[15]      Notably, however, in its motion for summary judgment F. Hyman relied on Schirmer's opinion that Lake River was under a duty to store goods in a warehouse with sprinklers and on part of Schirmer's interpretation of the BOCA code as it pertained to Lake River. Def. Brf., p. 13. In fact, F. Hyman even stated that for purposes of its motion, it would not contest Schirmer's opinions in this regard. Def. Brf., pp. 13-15, fn. 5.

19

witnesses list their qualifications and explain the bases for their opinions in their expert reports. Exs. 13, 15, 22 of Ferreti Aff. F. Hyman does not sufficiently explain how the witnesses' qualifications are insufficient or cite to any authority in support of its argument. As such, F. Hyman's motion to strike is denied.

## CONCLUSION

For the reasons stated above, F. Hyman's motion for summary judgment (Docket Entry #35-1) is denied. F. Hyman's request for fees and costs (Docket Entry #35-2) and request to strike the opinions of Buddy Jenkins and Chester Schirmer from the record (Docket Entry #51-1) are also denied. The parties shall appear for a status hearing on October 29, 2003 at 9 a.m.

NAN R. NOLAN
United States Magistrate Judge

Dated: September 29, 2003